[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, whose birth name was Margaret F. Carmichael, CT Page 1947 and the defendant were married at Nashua, New Hampshire, on September 1, 1984. They have three (3) children, issue of their marriage, Michael, born April 25, 1985, Margaret, born April 7, 1986, and Molly, born June 24, 1987. The plaintiff gave birth to another child, not issue of the marriage. John Tucker Carmichael was born on June 5, 1996. According to the plaintiff, John Stonkus is the father of that child, whose paternity has not yet been judicially determined. The parties have resided in the state of Connecticut for the period required to meet the jurisdictional elements of this matter.
The plaintiff testified that she was twenty-four (24) years old at the time of the marriage, and a homemaker during the course of the marriage. The defendant is a Trooper with the Connecticut State Police. She said that her husband made the financial decisions, and that she was happy to stay at home to take care of the children and family. They moved into the Phillips Drive home about six (6) months after the marriage. She had sold a previous home that she owned, and used the sale proceeds to buy the current home. (Plaintiff's Exh. 1) The net proceeds of that sale were Thirty-six Thousand ($36,000.00) Dollars, and the rest came from savings, which she claims in cross-examination, were her funds. Approximately Sixty Thousand ($60,000.00) Dollars was invested as a down payment into the current family home. The balance on the mortgage is reflected on the financial affidavit.
She is in reasonable health. She delivered her last child by Caesarian section, and any other health problems for which she took prescribed narcotics have ended. She does not expect any problems from her recent delivery.
The plaintiff has credits after two years of college, at Mattatuck Community College in 1978 and 1979, and was working at Filene's prior to the birth of her last child. She will work part-time until September, then go full-time. She works on commission. She hopes to earn Eight ($8.00) Dollars per hour. On earlier financial affidavits, she reported One Hundred, Fifty-six ($156.00) Dollars per week. She inherited a condominium and a stock account from her mother, who died in December of 1993. She had been receiving income from the rental of the condo, which is not available to her now. Her mother had been quite ill before she died. The plaintiff was her only child, and they were very close. The plaintiff testified that she did not bother to ask him for emotional support. She had given up hoping that that CT Page 1948 would ever occur. Her mother decided to end dialysis, and she assisted her mother in the dying process for six weeks. During that time, if she returned home from her mother's, he immediately left and expected her to take care of the children.
The inventory of the estate of Margaret F. Carmichael is Defendant's Exhibit 9. It confirms that she was left the condominium valued for estate purposes, and she is in possession of an offer for purchase for One Hundred, Thirty-five Thousand ($135,000.00) Dollars which was her counter to their original offer of One Hundred, Twenty-five Thousand ($125,000.00) Dollars. She also agreed that she received stock and cash. The account at Merrill, Lynch had been restrained during the course of this action, but for Judge Shortall's order of June 13, 1996. There remains Fifteen Thousand ($15,000.00) Dollars. She believes that some Christmas expenses were paid from these funds. A 1995 financial affidavit showed a balance of Ten Thousand ($10,000.00) Dollars in that account.
The plaintiff believes that her marriage began to break down in 1991 and 1992, when the children were all in school full time. She testified that she was not allowed to work outside the home. She believed that her husband was only happy when he knew exactly where she was. She asked to work part-time, and said he could work one extra highway job and bring in the same money she would make working part-time, after child care expenses were paid. She testified that he was negative of everything she wanted to do. She was put down when he said that the only thing she was able to do all her life was "wipe butts and noses." There was a limit to their communication which did not assist their relationship.
She conceeded during cross-examination that she had tried home health nursing after her mother's death in 1993, but she did not retain that employment. She said that the children's schedules and going into rehabilitation for her drinking prevented her from continuing that employment. She was in rehabilitation twice, once prior to the institution of this dissolution action, and once following it, but the plaintiff could not recall the dates. In 1991 and 1992, she was actively drinking, trying to go to AA, but she had not gone into rehabilitation. In 1992-1994, she progressed from a social drinker to drinking at home alone. She did not drink daily, but did allow alcohol to take over her life. She denied during the early stages of this case that she had a problem with alcohol. She could not recall specifics of hospitalizations, or police CT Page 1949 responses when she was under the influence.
On cross-examination, she agreed that she had not disclosed her use of prescription drugs to her husband earlier, and that she now understands that her abuse of those drugs was simply a substitution of substances, rather than dealing effectively with her addiction. On redirect, she admitted that her recovery is a process, and that relapse is a possibility. She did say that none of these things had happened to her prior to 1991, and that her husband had called the police during some of the incidents, and he later told her he did that so that her problem would be documented.
The plaintiff is a recovering alcoholic, whose drinking admittedly got out of control during the 1991-1992 time period. She claimed that he was not accepting any suggestion that they spend time with one another as the children got older, nor would he attend Al Anon meetings to understand the family dysfunction. Drinking had not been an issue for her until the children went into school. Counselors asked him to attend meetings, which he did not accept. He did not want to learn about co-dependency issues, according to her. He would not take alcohol out of the house, and continued to put her down. She testified on redirect that his actions and the breakdown of the marriage did not cause her alcoholism. She did not deal effectively with the stressors of a bad marriage and a divorce because of her alcoholism however.
She plans to sell her condominium and move. She does not want to live permanently in the marital home. She is looking in Southington, which is closer to her work, and the town has good schools. Her husband managed all of the family finances. If he said she could not spend money, she would ask her mother. Throughout the marriage, he controled the purse strings. He has a pension with the State of Connecticut, and she made no provision for retirement during the course of the marriage.
The parties have a home equity loan which the plaintiff indicates was used to buy their prior automobile. The plaintiff has a new automobile which she uses to transport herself and the children, and the defendant uses his State Police cruiser full-time.
She testified that she did not believe that he wanted a divorce, and did not ever credit her statements that she was CT Page 1950 unhappy with him. She claimed that he was overpowering. She testified that her decision to divorce was a painful one, where she recognized that it would be very difficult for the children. She said she believed that neither party was more at fault than the other. Both have been seriously hurt during the process, and she recognizes that the divorcing process has had a negative impact on the family.
She expects that the personal property of the marriage will be divided between the parties, and during testimony the court indicated that if they were unsuccessful in any division, they would hire a mediator and share the cost of that process equally. That is an order of the court.
Their son is doing well in school, and their middle child, while she needs additional help, gets that through the public school system. Their youngest will also get extra help with math, but that will be done without cost to the parties.
On cross-examination, she was questioned concerning her friendship with Ernie Conti. She has known him since 1993, and admitted a sexual relationship with him. She could not recall the date of that nor would she admit that that involvement was prior to the filing of this action. She claimed that they are friends. He did not attend meetings. She could not remember an event on March 18, 1994 when they were confronted by her husband at the Day's Inn. She conceded that before that date, her relationship was established with Mr. Conti.
The defendant, from 1990 on, worked days, five on and three off, with night overtime highway jobs.
The debts of the parties are reflected on their financial affidavits. The home equity loan represents a borrowing for the car she drives, originally a Toyota that was destroyed in a fire, but was replaced by the automobile she is currently driving. She claims that he should pay one-half of the debt service on the car purchase, insofar as he is provided with a vehicle through his employment. The debts on her financial affidavit are otherwise her debts.
The plaintiff testified that she no longer wanted to remain in the marital home, and has no problem with the defendant's retaining the home for his time with the children, so long as the property distribution takes her interest into account. CT Page 1951
The court was to conclude the court day, when there began a discussion concerning the ability of the parties to assess their positions relative to the birth of John Tucker Carmichael, at Yale New Haven Hospital, prematurely. The father of the child is Mr. Stonkas, who has acknowledged paternity and listed the child as a beneficiary on his health insurance policy. Many of the financial issues which created uncertainty in the financial picture for the parties have been resolved, except for the need for the plaintiff to be at home with the infant, limiting her ability to be employed. The reason for her inability to work full-time outside the home was her adult decision to procreate outside the marriage, and the unfortunate premature birth of her infant. She only receives a temporary stipend of support for the minor child through Social Security Supplemental Security Income. That stipend is about to expire.
At the end of the court day, the court bifurcated the financial issues, but entered orders with respect to custody and parenting time, and entered a decree dissolving the marriage, based upon the parties' stipulation that their marriage had irretrievably broken down. The plaintiff elected to use her birth name, and the court ordered the restoration of the name Carmichael to her.
The trial was adjourned to a date whereby the parties could confirm paternity and health insurance for that child, especially in light of his premature birth and attendant health-care costs. The parties confirmed to the court upon reassignment that that issue had been resolved, and the child was in fact covered by his father. The trial continued on November 26, 1996, and again on December 3, 1996.
The plaintiff is exploring employment and will seek employment with an hourly range of $8.50 to $10.00 as a nurse's aid, or retail at around $6.50 per hour. The father of her infant has offered to parent the child while she works, and has made financial contributions to her for the child.
The plaintiff conceded on cross-examination that she has Ten Thousand ($10,000.00) Dollars in an escrow account held by her attorney, which asset is not reflected on her financial affidavit. The plaintiff was unclear as to what sums were spent and when and on what during her testimony. CT Page 1952
The plaintiff called James A. Gobes, an actuary, to testify as to the current value of the pension plan. The defendant also maintains a deferred compensation plan, which was valued at Eighteen Thousand, Eight Hundred, Thirty-three and 62/100 ($18,833.62) Dollars. The witness valued the pension for the period of the marriage, using a discount factor of six and one-half (6 1/2%) percent, as Eighty-four Thousand, Three Hundred, Sixty-seven ($84,367.00) Dollars. Thereafter, he was recalled, and asked to review the income tax information from 1994, which included base salary and overtime. He proposed revised values for the pension, and indicated the present value to be One Hundred, Sixteen Thousand, Three Hundred, seven ($116,307.00) Dollars. The value of the deferred compensation has not changed. The witness seemed to make a new computation during a morning recess, and the basis therefor was a tax return.
On redirect, the plaintiff claimed that when she relocated to Southington, and had movers after the sale of the Watertown condominium, the defendant refused to allow her to remove all of her property. She recited a list of desired property. The court has previously ordered that those issues be mediated and that the parties share the cost of such mediation. They may not use Family Services to mediate the personal property issues.
The plaintiff called the defendant to testify. The witness was asked as to his earnings in calendar 1996 to date, which was approximately Fifty Thousand ($50,000.00) Dollars. He earned slightly more in total for 1995. He purchased a 1988 Suzuki Samari which has a blown motor, last week, for Five Hundred ($500.00) Dollars. He has not paid child support since the children moved to Southington, but has purchased food, clothing, and given them lunch money for school. He had not paid child support earlier, because the parties had cohabited. There is no current order of child support as a result. He claimed in his testimony that he had the children every weekend since the parties separation approximately one (1) month ago. He agreed that she had asked him for money for child support and that he had refused the request.
He agrees that the marriage was irretrievably broken down, and testified that in about 1990 or 1991 the marriage encountered real problems. Her mother was ill. He blamed the breakdown of the marriage on her substance abuse problems. He denied that he had a gambling problem, although he did admit that he went to Ledyard frequently. He agreed that he had spent time with the CT Page 1953 children at the Mohegan Sun casino.
He continues to live in the marital home with Douglas Leach, who he called his nanny. Mr. Leach has known the children and the parties for approximately seven (7) years, and he babysits in exchange for room and board. The defendant testified that he derives no financial benefit from his presence in the home. However, the defendant is able to take a highway construction overtime job if Mr. Leach is available to watch the children. He has other caregivers, including his mother, and others, for the children as well. The children also have friends with whom they spend time. If the defendant works during that period, the children can spend the night with his mother. He maintains that regardless of their move to Southington, that he continues to spend approximately fifty (50%) percent of the time with the children.
He agreed that he managed the family finances during the course of the marriage. He does not feel that the plaintiff handles money well, and that the large gifts from her mother were not to get them out of debt, but rather because they were so close. He denied that he had been removed as her mother's executor as a result of mismanagement of the assets of the estate.
He agreed as well that the plaintiff had a home which she sold to fund the down payment for the marital home. The contribution was approximately Sixty Thousand ($60,000.00) Dollars.
The defendant owned and operated a deli prior to his employment with the Connecticut State Police on July 15, 1985, which he sold three years later. The parties were living together at the time he purchased the deli, the funds for which came from the sale of a home he owned prior to his involvement with the plaintiff. She helped at the deli, but was pregnant with their first child, so it was difficult. They were living on Claremont Street, in her home. That home was owned by the plaintiff, and had been purchased in 1983, when the defendant purchased the deli. They discussed purchasing the house with the money she had in the bank. They looked at the home together, and had in fact made investments together prior to their marriage.
The house needed renovations, which the defendant did. The materials were purchased by the plaintiff. They renovated the CT Page 1954 kitchen, the hardwood floors, papered, built a closet on the porch, and cosmetic work on the basement. He claims that his efforts at renovation increased the value of the investment. Because of her pregnancy at the time they lived at that property, she left her employment, and he had two jobs to meet the family expenses.
The defendant produced the most current value of his deferred compensation plan, which is Pl.'s Exh. 24. He has as well a defined pension plan, about which there has been expert testimony. (Pl.'s Exh. 25) The defendant testified that the hours worked in highway construction overtime, as distinguished from the regular state police overtime, would not be added to the value of the pension. The defendant testified that he received highway construction overtime seasonally, so it was computed annually. Pl. Exh. 27 shows that in 1995 the defendant earned approximately Ten Thousand ($10,000.00) Dollars in highway construction overtime. His rate of pay is approximately Thirty ($30.00) Dollars per hour.
He claims that in 1990 to 1991, the plaintiff was addicted to alcohol, had extra-marital affairs, and persisted in behavior which kept her away from the home at night, when she would get rides home from others after misplacing her automobile. She was taken to the hospital after drinking too much, often by ambulance, both from home and from her workplace. He claims that the behavior well pre-dated the filing of the writ in this case, and that they maintained the same home until the sale of the Watertown condo, and her purchase of the home in Southington.
The defendant claims to be paying many of the family debts, all of which are exhibits in this action.
The defendant agreed that he spent some time at Foxwoods, and had friends testify that many of the charges on his "wampam card" were in fact theirs. The testimony was of little interest to the court. It appeared that the defendant's interest did not rise to the level of an addiction.
The court has had an opportunity to assess the evidence of this rather extended hearing on the financial issues of this marriage. The issues were seriously compromised by the out-of-wedlock birth of a premature infant. The plaintiff has seriously compromised her life by her addictions, and by her irresponsible adult decisions to procreate during a contested divorce, CT Page 1955 subjecting the children of this marriage to great upheaval. The parties also expended financial and emotional resources which they could ill afford during this time. It was painful to watch. Regardless of the intervention of the court, the plaintiff proceeded to act in ways which seriously undermined her ability to be a resource to the children. She seems to have progressed, and the court believed her when she admitted that, for her, relapse was a real possibility. As a result, the court must fashion orders which allow the father to easily fill in for her should that eventuality occur.
Based upon a review of the evidence, in light of the mandatory statutory criteria, and reviewing the proposed orders of the parties the court makes the following orders with respect to property and support:
1) CHILD SUPPORT: The defendant shall pay Two Hundred ($200.00) Dollars as child support. While the defendant spends a good deal of time with the children, requiring him to contribute less than the guidelines amount, the parents of these children do not "share" parenting to the extent originally contemplated. As articulated by the court on the record, that is due in part to the move by plaintiff to the Town of Southington, and the need for the children to remain in one school system. Child support shall be paid until the respective child dies, is emancipated, reaches his or her eighteenth birthday, or graduates from high school during his or her nineteenth year, whichever first occurs.
The payment of child support shall be by contingent wage withholding, and payable between the parties. If the parties agree that the payment shall be made bi-weekly so as to coincide with the defendant's pay periods, such payment shall be made in advance rather than in arrears.
The defendant shall continue to provide whatever health-related benefits are available to him through his employment for the benefit of the minor children. The provisions of C.G.S. Sec.46b-84 (c) shall apply. All unreimbursed health-related expenses of the minor children shall be shared between the parties.
The defendant shall maintain the maximum life insurance available to him as a benefit of his employment and name the children as irrevocable beneficiaries of that insurance until such time as his obligation to pay child support ceases. CT Page 1956
2) ALIMONY: There shall be no obligation to pay alimony from or by either party to this action. The court finds that the plaintiff has acquired assets from her inheritance which have afforded her the opportunity to acquire other assets. Her conduct which now diminishes her ability to work more gainfully outside the home, or to complete her education, was her adult decision to complicate her life, and she must be responsible for it.
3) REAL PROPERTY: Insofar as the plaintiff acquired the Southington property from the proceeds of her inheritance, she shall retain that property free and clear from any claim of the defendant. With respect to the marital home in Watertown, the plaintiff shall transfer all of her right, title, and interest in and to such property to the defendant. The defendant shall hold the plaintiff harmless from the first mortgage on that property, and henceforth shall be responsible for all taxes, homeowners insurance, and repairs to that property.
In light of the contribution that the plaintiff made in the acquisition of that property, and her contribution to the marriage prior to its breakdown, the court orders that the defendant execute a note, secured by a mortgage payable to the plaintiff in the amount of Fifty Thousand ($50,000.00) Dollars. Such note and mortgage shall be payable on June 24, 2005, which coincides with the eighteenth birthday of the youngest child of the parties. Such note shall bear interest at five (5%) percent per annum.
In making this award, the court finds that the defendant has limited ability to acquire assets as he pays support for his children, and must retain possession of the marital home if that home must become the primary home for the children should the mother relapse. The court also rejects the request of the plaintiff that the home be sold for her to recoup her original investment. Much has transpired since that date, and in light of the other orders of the court, it is not meritorious.
4) PENSION: The defendant shall transfer to the plaintiff by QUADRO one-half of the value of his pension from the date of his employment to March 15, 1994, the date the complaint for dissolution of the marriage was served upon the defendant.
5) AUTOMOBILES: The parties shall retain the automobiles currently in their possession, and pay an outstanding CT Page 1957 indebtedness thereon and hold the other harmless therefrom. The plaintiff shall pay the equity line of credit on the marital home which represents the original debt for the purchase of her automobile, which since has been replaced. The parties shall cooperate in any title documents which might need to be executed to effect such transfer.
6) BANK ACCOUNTS AND DEBTS: The parties shall pay any debts not specifically mentioned above which are listed on their respective financial affidavits. The parties shall retain any interest they have in their own bank accounts.
7) PERSONAL PROPERTY: The parties shall retain the personal property presently in their possession, except that the defendant shall return to the plaintiff her grandfather's desk. The defendant shall retain the Carmichael crest ring for the minor child Michael.
8) ATTORNEYS FEES: The court orders that the parties shall be responsible for their respective attorney's fees. The court has reviewed the request of the defendant for an allowance to defend in light of all of the facts of the case. In light of the property distribution, the court declines to grant this proposed order of the defendant.
The court had earlier ratified the agreement of the parties with respect to their care of the children of their marriage. The orders above were the outstanding issues before the court. The orders with respect to child support shall take effect during any appeal.
Judgment shall be final with the entry of the above financial orders.
DRANGINIS, J.